UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| ZYHERE L. FICHMAN,<br><br>               Plaintiff,<br><br>     v.<br><br>JOSEPH MERCER, individually and in his official capacity as a Sparks Police Department Officer; CITY OF SPARKS, a municipal corporation, JOHN DOE Defendants 1-10; RED AND WHITE CORPORATIONS; BLACK AND BLUE MUNICPAL ENTITIES 2 – 10,<br><br>               Defendants. | Case No. 3:19-cv-00292-MMD-CBC<br><br>ORDER |

## I.    SUMMARY

Plaintiff Zyhere Fichman alleges that Defendant Joseph Mercer unlawfully arrested him in connection with an armed robbery. Before the Court is Defendants Mercer and City of Sparks' motion to dismiss the Complaint ("Motion") (ECF No. 12). The Court has reviewed Plaintiff's response (ECF No. 16) and Defendants' reply (ECF No. 17). For the following reasons, the Court grants in part and denies in part Defendants' Motion.

## II.    BACKGROUND

The following allegations are taken from the Complaint (ECF No. 1) unless otherwise indicated.

Kelly Kendrick, a 19-year-old woman, called 911 on June 2, 2017, to report that a group of men robbed her at gunpoint at her apartment in Sparks. (*See id.* at 5, 7.) Kendrick called from the apartment of a neighbor—Yvonne Hernandez—because the men allegedly snapped her phone in half. (*See id.*)

Officers Kimberly Hodge and Chris Rowe responded and interviewed Kendrick and some of her neighbors. (*Id.* at 5.) Kendrick said she believed the robber was her ex-boyfriend, a man named Sirmario De La Paz, with whom she had broken up earlier that

1 day. (*Id.*) Kendrick also said that she was robbed because "they" had asked her for money
2 to buy drugs and she had refused. (*Id.*) One of Kendrick's neighbors—Hernandez—told
3 Hodge she did not hear anything until Kendrick came to her door. (*Id.* at 6.) Two other
4 neighbors—Kennedy Garrett and Roderick Miller—said that Kendrick and her boyfriend
5 fight all the time. (*Id.*) Garrett said she heard fighting, a door slamming about 20-30
6 minutes later, and then Kendrick knocking loudly on neighbors' doors asking for help. (*Id.*)
7 Garrett and Miller both saw one man with dark hair and a white shirt jogging away from
8 the building. (*Id.*)

9 Defendant Mercer arrived at the scene after the first two officers, but he took over
10 the investigation because he believed the suspects were affiliated with a gang. (*Id.* at 5.)
11 Mercer brought up Plaintiff's name and said he thought Plaintiff was involved (*Id.* at 6.)
12 Mercer claimed in his report that Kendrick told him she was "220% positive" that Plaintiff
13 was the armed robber. (*Id.*) Mercer "put Plaintiff's name in Ms. Kendrick's head when it
14 otherwise would not have been there." (*Id.* at 7.) Kendrick told Mercer that she thought
15 Plaintiff was the gunman because the gunman and the other men were dressed in all
16 black; the gunman had an "'afro'-style" haircut (like Plaintiff); and the gunman spoke in a
17 low, smooth voice. (*Id.*) Kendrick told Mercer that she thought she saw De La Paz when
18 she looked out the peephole of her apartment and that he was wearing a white shirt with
19 Japanese letters on the side of the arm. (*Id.*)

20 Kendrick believed that De La Paz and the other robbers were at a location on
21 Grove Street in Reno, about 5 or 10 miles away from Plaintiff's residence. (*See id.* at 8.)
22 Kendrick went there with Hodge but was unable to identify any perpetrators. (*Id.*) Hodge
23 called Mercer, who advised that he had located Plaintiff and "the others" at Plaintiff's
24 residence. (*Id.*)

25 ///
26 ///
27 ///
28 ///

2

Hodge drove Kendrick to Plaintiff's residence. (*Id.*) Plaintiff had been stopped in a vehicle with three other young men who were members of YLOC.[1] (*See id.* at 9.) Kendrick testified at Plaintiff's preliminary hearing that these three were not involved. (*Id.*) Kendrick refused to make a written or oral report. (*Id.*)

The state court took evidence at Plaintiff's preliminary hearing. (*See id.* at 5.) Kendrick testified to the following at the preliminary hearing. Mercer was familiar with YLOC. (*Id.* at 6.) Mercer brought up Plaintiff's name and said he thought Plaintiff was involved. (*Id.*) When the police interviewed Kendrick, she said she was "220% certain that Fichman was there"—not "220% positive" that Plaintiff was the armed robber. (*Id.*) She did not see Plaintiff's vehicle at her apartment at or about the time of the robbery. (*Id.* at 8.) She identified Plaintiff and an individual named Anthony Henry when she went to Plaintiff's residence. (*Id.*) Plaintiff was wearing grey sweatpants, no shirt, and no boots. (*Id.* at 9.)

Carlos Lee, one of the men in Plaintiff's car, testified that Plaintiff was with him and the others the entire day, including and especially during the timeframe of the alleged robbery. (*Id.*)

Plaintiff alleges that a reasonable police officer would have been suspicious of Kendrick's identification of Plaintiff as the robber based on the following:

- Kendrick initially told Officers Hodge and Rowe that she believed De La Paz—not Plaintiff—was the robber. (*Id.* at 5-6.)
- Garrett and Miller's description of the man they saw jogging away from the building matched De La Paz—not Plaintiff. (*Id.* at 6.)
- The gunman could not have perpetrated the armed robbery using a "low, smooth voice" because he used harsh language such as: "Shut the fuck up. Don't say anything. Turn around." (*See id.* at 7.)

///

---

[1] Two of the remaining three individuals were identified as Anthony Henry and Carlos Lee. (ECF No. 1 at 9.) YLOC is the name of a rap group to which Plaintiff belongs. (*Id.* at 6.)

3

- Kendrick told Mercer that the gunman and the other man were wearing black pants, black boots, and big, black jackets, but she also told him that she saw a man with a white shirt printed with Japanese letters on the side of the arm when she looked out her apartment peephole. (*Id.*)
- The neighbors did not hear anything even though Kendrick claimed that the robbers carried out her 55" television, 32" television, Playstation, games, movies, Roku, and jewelry. (*Id.*)
- Nothing in Mercer's report corroborated the claim that Kendrick even owned the items she claimed were stolen. (*Id.* at 8.)
- Kendrick's cell phone could have been broken by just one person (*e.g.*, De La Paz). (*Id.*)
- Kendrick did not know where Plaintiff resided and had never been to his home. (*Id.*)
- Plaintiff was wearing grey sweatpants, no shirt, and no boots when he was identified and arrested—not black pants, black boots, and a big, black jacket. (*Id.* at 9.)
- Kendrick refused to make a report, suggesting that she was afraid of perjuring herself. (*Id.*)

Drawing all reasonable inferences in Plaintiff's favor at this stage of the litigation, Plaintiff also alleges that Mercer fabricated evidence based on the following:

- Mercer claimed in his report that Kendrick told him she was 220% positive that Plaintiff was the armed robber even though Kendrick testified at the preliminary hearing that she only said she was "220% certain that Fichman was there." (*Id.* at 6.)
- Mercer went to Plaintiff's residence instead of the residence where Kendrick thought the perpetrators would be, even though Kendrick did not know where Plaintiff resided and had never been to his home. (*Id.* at 8.)

4

- Both Plaintiff and Anthony were arrested but Anthony was later released without being charged. (*Id.* at 9.)
- Mercer only arrested Plaintiff even though he was found in a vehicle with three other men and even though a "gang of four plus De La Paz" had allegedly robbed Kendrick. (*Id.*)
- Mercer used a single witness identification even though it was not trustworthy or reliable. (*Id.* at 10.)

Plaintiff also suggests that Mercer ignored exculpatory evidence by failing to interview Carlos Lee even though Kendrick's identification was suspicious. (*Id.* at 9.)

Plaintiff alleges that if Mercer had conducted a one hour or less investigation stop under NRS § 171.123(1) and (4), he would have discovered that Plaintiff's residence and vehicle contained no incriminating evidence; that Kendrick wrote on social media that Plaintiff was not one of the robbers; and that Plaintiff's cell phone records would show he was not at the scene of the alleged crime when it occurred. (*Id.* at 11.)

Plaintiff alleges that Mercer knew or should have known that a single witness identification of a previously-known suspect at his home miles away from the scene of the alleged crime would be constitutionally improper. (*Id.* at 10.)

Plaintiff alleges the following causes of action: (1) unreasonable seizure against Mercer under 42 U.S.C. § 1983 and (2) violation of procedural due process against the City of Sparks under 42 U.S.C. § 1983. (*Id.* at 14-15.) Plaintiff seeks special damages, general damages, and punitive damages. (*Id.* at 15.)

## III. LEGAL STANDARD

A court may dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A properly pleaded complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While Rule 8 does not require detailed factual allegations, it demands more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). "Factual allegations must be enough to rise above the speculative level." *Twombly*, 550 U.S. at 555. Thus, to survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

In *Iqbal*, the Supreme Court clarified the two-step approach district courts are to apply when considering motions to dismiss. First, a district court must accept as true all well-pleaded factual allegations in the complaint; however, legal conclusions are not entitled to the assumption of truth. *Id.* at 678. Mere recitals of the elements of a cause of action, supported only by conclusory statements, do not suffice. *Id.* at 678. Second, a district court must consider whether the factual allegations in the complaint allege a plausible claim for relief. *Id.* at 679. A claim is facially plausible when the plaintiff's complaint alleges facts that allow a court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* at 678. Where the complaint does not permit the court to infer more than the mere possibility of misconduct, the complaint has "alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* at 679 (alteration in original) (internal quotation marks omitted). When the claims in a complaint have not crossed the line from conceivable to plausible, the complaint must be dismissed. *See Twombly*, 550 U.S. at 570.

## IV. DISCUSSION

### A. Issue Preclusion

Defendants argue that Plaintiff's unlawful arrest claim is barred by the doctrine of issue preclusion. (ECF No. 12 at 9-11.) Plaintiff alleges that Mercer arrested Plaintiff without probable cause, but Defendants contend that this issue was fully and fairly litigated at Plaintiff's preliminary hearing. (*Id.*) There, the Justice of the Peace found that Plaintiff's arrest was supported by probable cause, binding him over for trial. (*Id.*)

"The doctrine of issue preclusion prevents relitigation of all 'issues of fact or law that were actually litigated and necessarily decided' in a prior proceeding." *Robi*, 838 F.2d

at 322 (quoting *Segal v. Am. Tel. & Tel. Co.*, 606 F.2d 842, 845 (9th Cir. 1979)). Under Nevada law,[2] issue preclusion applies if the following factors are satisfied: "'(1) the issue decided in the prior litigation must be identical to the issue presented in the current action; (2) the initial ruling must have been on the merits and have become final; . . . (3) the party against whom the judgment is asserted must have been a party or in privity with a party to the prior litigation'; and (4) the issue was actually and necessarily litigated." *Alcantara ex rel. Alcantara v. Wal-Mart Stores, Inc.*, 321 P.3d 912, 916 (Nev. 2014) (alteration in original) (quoting *Ruby*, 194 P.3d at 710). The proponent of issue preclusion bears the burden of demonstrating that the doctrine applies. *See, e.g.*, *Bower v. Harrah's Laughlin, Inc.*, 215 P.3d 709, 718 (Nev. 2009); *Marine Midland Bank v. Monroe*, 756 P.2d 1193, 1194 (Nev. 1988).

The bindover order does not have preclusive effect because it never became final. Rather, Plaintiff appealed the bindover order by filing a petition for habeas corpus and a motion to suppress. *See Haupt v. Dillard*, 17 F.3d 285, 288 (9th Cir. 1994), *as amended* (Apr. 15, 1994) ("[T]he probable cause determination was immediately appealable (in the form of a petition for a writ of habeas corpus)."). And before any decision could be reached on the petition or the motion, the state moved to dismiss the case. (ECF No. 16 at 5.)

Moreover, "collateral estoppel does not apply when the decision to hold a defendant to answer was made on the basis of fabricated evidence presented at the preliminary hearing or as the result of other wrongful conduct by state or local officials." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1068 (9th Cir. 2004). Construing all reasonable inferences in favor of Plaintiff at this stage of the litigation, Plaintiff has alleged that the bindover order was predicated on wrongful conduct by Mercer. According to Plaintiff, Mercer inserted Plaintiff's name into Kendrick's head in order to obtain an

///

///

---

[2] The Court must apply Nevada's collateral estoppel rules in this case (not federal common law) because Defendants seek to give preclusive effect to a prior Nevada state court judgment (not a federal court judgment). *See In re Cantrell*, 329 F.3d 1119, 1123 (9th Cir. 2003) (citing 28 U.S.C. § 1738).

7

erroneous identification of the robber. (*See* ECF No. 1 at 6.) Thus, the *Awabdy* exception applies.

Defendants rely on *Haupt* (ECF No. 12 at 9-11), but *Haupt* does not establish that a bindover decision alone has preclusive effect. Rather, *Haupt* demonstrates that a bindover order in conjunction with subsequent affirmance (i.e., when the trial court denies the criminal defendant's petition for writ of habeas corpus) is sufficiently final to have preclusive effect. *See Haupt*, 17 F.3d at 289 ("Thus, we conclude that the probable cause determination at Haupt's preliminary hearing, affirmed by denial of his petition for a writ of habeas corpus, was sufficiently conclusive of the issue to preclude its relitigation.").

Defendants also rely on this Court's decision in *Pierson v. Storey County*, No. 3:12-CV-00598-MMD, 2015 WL 995124 (D. Nev. Mar. 5, 2015), *aff'd sub nom. Pierson v. County of Storey*, 682 F. App'x 577 (9th Cir. 2017), but the Court did not expressly contemplate the finality of the bindover decision in that case. *See Pierson*, 2015 WL 995124, at *4. Moreover, the criminal defendant in that case filed a petition for writ of mandamus (to prohibit the district court from proceeding to trial or, in the alternative, to dismiss the charges) that the Nevada Supreme Court denied. *Id.* at *2. The bindover decision—essentially affirmed by the Nevada Supreme Court's denial of the criminal defendant's mandamus petition—was thus sufficiently final to have preclusive effect.

Defendants also rely on *Wige v. City of Los Angeles*, 713 F.3d 1183 (9th Cir. 2013), but the Ninth Circuit did not contemplate the finality of the bindover decision in that case. Rather, the Ninth Circuit explained that the "identity of issues" element of the issue preclusion inquiry is usually satisfied in unlawful arrest cases. *Wige*, 713 F.3d at 1185.

Accordingly, the Court rejects Defendants' argument that issue preclusion bars Plaintiff's claim against Officer Mercer.

**B.     Whether Plaintiff Has Stated a Claim**

Defendants argue that Plaintiff has failed to state a claim against Mercer because Mercer had probable cause to arrest Plaintiff. (ECF No. 12 at 11-20.) The Court disagrees.

///

Plaintiff's claim against Mercer for unlawful arrest is a claim "cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1018 (9th Cir. 2015) (quoting *Lacey v. Maricopa County*, 693 F.3d 896, 918 (9th Cir. 2012)). "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe an offense has been or is being committed by the person being arrested." *John v. City of El Monte*, 515 F.3d 936, 940 (9th Cir. 2008) (quoting *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007)). Courts look to "the totality of the circumstances known to the arresting officers, [to determine if] a prudent person would have concluded there was a fair probability that [the defendant] had committed a crime." *Id.* (alterations in original) (quoting *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986)). "The determination whether there was probable cause is based upon the information the officer had at the time of making the arrest." *Id.* (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). If an "unquestionably honest citizen" reports criminal activity—which if fabricated would subject her to criminal liability—"rigorous scrutiny on the basis of [her] knowledge [is] unnecessary." *United States v. Butler*, 74 F.3d 916, 921 (9th Cir. 1996) (quoting *Illinois v. Gates*, 462 U.S. 213. 233-34 (1983)). Once probable cause to arrest someone is established, a law enforcement officer is not required to investigate every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent. *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir. 2003) (quoting *Baker v. McCollan*, 443 U.S. 137, 146 (1979)).

At this stage of the litigation, the Court accepts the following facts as true, having drawn all reasonable inferences in Plaintiff's favor. Mercer had a vendetta against Plaintiff and inserted his name into a presumably frazzled Kendrick's head when he interviewed her in order to manufacture probable cause to arrest Plaintiff. Mercer then ignored all exculpatory evidence and proceeded to arrest Plaintiff. Specifically, Mercer ignored the allegations of Kendrick's neighbors that they did not hear a robbery and that they only

9

saw one person—matching De La Paz's description—jogging away from the building. Mercer also failed to conduct a reasonable investigation into whether Plaintiff actually was the robber.

These facts demonstrate that Mercer lacked probable cause to arrest Plaintiff. Accordingly, the Court finds that Plaintiff has stated a claim for unlawful arrest against Mercer.

### C.     Qualified Immunity

Defendants also argue that Mercer is entitled to qualified immunity. (ECF No. 12 at 20-21.) Again, the Court disagrees at this stage of the litigation.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Generally, courts apply a two-step analysis to determine whether qualified immunity applies to bar certain claims. First, a court decides whether the facts *as alleged by the plaintiff* make out a violation of a constitutional right. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) (emphasis added), *holding modified by Pearson v. Callahan*, 555 U.S. 223 (2009). Second, the court decides whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id.* Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

"The doctrine of qualified immunity does not require that probable cause to arrest exist." *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1443 (9th Cir. 1991). "Even absent probable cause, qualified immunity is available if a reasonable police officer could have believed that his or her conduct was lawful, in light of clearly established law and the information the searching officers possessed." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

///

The facts as described *supra* Section IV(B) are sufficient to show that Mercer arrested Plaintiff without probable cause or even a reasonable belief that he had probable cause. A reasonable officer who had a vendetta against an individual and improperly suggested that individual's name to a crime victim in order to manufacture probable cause would not believe he had probable cause to arrest that individual. Thus, the first *Saucier* inquiry resolves in Plaintiff's favor.

The second *Saucier* inquiry—whether the right was clearly established—also resolves in Plaintiff's favor at this stage of the litigation. "[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001). Plaintiff has alleged facts to show that Mercer deliberately fabricated false evidence by improperly suggesting Plaintiff's name to Kendrick, who was in a state of distress.

Accordingly, the Court rejects Defendants' argument for qualified immunity at this stage of the litigation.

### D. Claim Against City of Sparks

Defendants argue that Plaintiff cannot state a claim against Sparks based on Mercer's alleged conduct. (ECF No. 12 at 22-24.) The Court agrees.

"A government entity may not be held liable under 42 U.S.C. § 1983, unless a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 694 (1978)). "In order to establish liability for governmental entities under *Monell*, a plaintiff must prove '(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation.'" *Id.* (quoting *Plumeau v. Sch. Dist. No. 40 Cty. of Yamhill*, 130 F.3d 432, 438 (9th Cir.1997)). "Municipal liability under section 1983 attaches only where

'a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 470 (1986)).

Plaintiff alleges that Mercer became a policymaker for and on behalf of Sparks by engaging himself as the lead detective. (ECF No. 1 at 13.) Plaintiff further alleges that Mercer "engaged in" the following unconstitutional policies:

- Arresting Plaintiff based upon a "one-person show-up identification" before a "victim" who already knew the person to be arrested, at his residence and miles away from the crime scene. (*Id.*)
- Writing facts in his report which were inconsistent with information from other sources at the scene and which consistently were refuted by sworn testimony at Plaintiff's subsequent preliminary hearing. (*Id.*)
- Failing and refusing to detain obvious suspects, based on the purported victim's testimony, and to interview them before making the decision to arrest Plaintiff. (*Id.*)
- Interjecting his prior knowledge regarding Plaintiff with the knowledge of the so-called victim, and thus pressing her to identify Plaintiff as the so-called armed robber. (*Id.* at 13-14.)

Plaintiff relies on these allegations to assert that Sparks violated his procedural due process rights and rights to be free from a continued false imprisonment. (*Id.*)

Defendants argue that the Chief of Police is the only person within Sparks Police Department ("SPD") who is expressly empowered to make final policy decisions for SPD. (ECF No. 12 at 23 (citing Sparks Municipal Code ("SMC") § 2.16.005(2)).) Thus, Defendants argue, Plaintiff at most has alleged that Mercer participated in constitutional violations—not that Sparks had a policy, that the policy amounts to deliberate indifference, or that the policy caused any constitutional violation. (*Id.* at 23-24.)

///

The Court agrees with Defendants. While Plaintiff has alleged that Mercer acted as a policymaker and "engaged in" various purportedly unconstitutional policies (ECF No. 1 at 13-14), these threadbare allegations are insufficient to allow the Court to infer more than a mere possibility of misconduct. Plaintiff has not alleged facts to show that Mercer's conduct the evening of Plaintiff's arrest established a policy, practice, or custom that applied to other officers or in other circumstances.

Plaintiff relies on *Nehad v. Browder*, 929 F.3d 1125 (9th Cir. 2019), to argue that a police officer can act as a policy maker. (ECF No. 16 at 22.) But that was not a holding in *Nehad.* Rather, the Ninth Circuit found that the victim of a police shooting introduced sufficient evidence to survive summary judgment (*e.g.*, evidence that the police department looked the other way when officers used lethal force) of an informal practice or policy that caused the shooting. *Nehad*, 929 F.3d at 1142.

Plaintiff also relies on *Pembaur*, 475 U.S. 469, to argue that a one-time act by a police officer can constitute evidence of a custom or policy. (ECF No. 16 at 22-23.) But Pembaur states "that municipal liability may be imposed for a single decision by municipal policymakers"—not ordinary policer officers acting in the course of their duties—"under appropriate circumstances." *Pembaur*, 475 U.S. at 480.

Because Plaintiff has failed to allege sufficient facts to support a *Monell* theory of liability, the Court will dismiss Plaintiff's *Monell* claim. The Court will dismiss this claim without leave to amend because amendment would be futile. A police officer in a gang unit in a city the size of Sparks with a substantial police force cannot constitute a policymaker for the purposes of a *Monell* claim.

### E. Punitive Damages

Defendants argue that Plaintiff has failed to state a claim for punitive damages. (ECF No. 12 at 21-22.) The Court considers Plaintiff's "claim" for punitive damages as a request for a specific form of relief. Accordingly, the Court will deny Defendants' motion as moot to the extent it is directed at Plaintiff's request for punitive damages.

///

## V. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motion before the Court.

It is therefore ordered that Defendants' motion to dismiss (ECF No. 12) is granted in part and denied in part. The motion is granted as to Plaintiff's *Monell* claim and denied as to Plaintiff's unlawful arrest claim against Mercer. The motion is denied as moot with respect to Plaintiff's request for punitive damages.

It is further ordered that Plaintiff's claim against the City of Sparks is dismissed.

DATED THIS 31st day of October 2019.

MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE